**CHARLES P. YOUNG COMPANY and Greater New York Mutual Insurance Company, Petitioners,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent,**

**Pennie K. Petrie, Intervenor.**

**No. 94–AA–582.**

District of Columbia Court of Appeals.

Submitted Sept. 28, 1995.

Decided Aug. 1, 1996.

---

452

Gerald Herz and Alan D. Sundburg were on the brief, Washington, DC, for petitioners.

Allen J. Lowe was on the brief, Washington, DC, for intervenor.

Garland Pinkston, Jr., Acting Corporation Counsel at the time the briefs were filed, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief, for respondent.

Before FERREN, TERRY, and SCHWELB, Associate Judges.

TERRY, Associate Judge:

Charles P. Young Company ("Young" or "the employer") and its insurance carrier seek review of a decision by the District of Columbia Department of Employment Services (DOES) granting a request for workers' compensation filed by Pennie Petrie, one of Young's employees. Ms. Petrie claimed that she had suffered emotional and psychological injury resulting from job-related stress. A hearing on her claim was held by a DOES hearing examiner. Shortly after it had ended, Young moved to reopen the record for additional testimony in light of new allegations made by Ms. Petrie at the hearing. This motion and a subsequent motion for reconsideration were both denied. A few months later the hearing examiner issued a compensation order directing the employer to pay Ms. Petrie temporary total disability benefits from March 27, 1990, to the present and continuing, and all related medical expenses.

Young appealed to the Director of DOES, asserting three errors: first, that the hearing examiner's refusal to reopen the record was arbitrary, capricious, and an abuse of discretion; second, that the examiner's finding that

Ms. Petrie was a credible witness was not supported by substantial evidence; and third, that the finding that Ms. Petrie's disability arose out of her employment was unsupported by substantial evidence and was contrary to law. The Director affirmed the hearing examiner's rulings with respect to the motion to reopen the record and Ms. Petrie's credibility, but remanded the case for further proceedings on the issue of whether she had suffered a compensable injury. The employer filed a motion with the Director seeking reconsideration of the first two issues, but it was denied.

The hearing examiner in due course issued a further order, ruling that sufficient evidence had been presented to establish that Ms. Petrie's emotional injury was compensable because it arose out of and in the course of her employment. After that order had become final under D.C.Code § 36–322(b)(2) (1993), Young and its insurance carrier filed with this court a petition for review, presenting the same three assignments of error. We find no merit in their arguments, and accordingly affirm.

I

Pennie Petrie went to work in 1982 for Charles P. Young Company, a financial printer. She was first hired as a typesetter, was promoted to assistant supervisor, and, at the time she went on sick leave in March 1990, was one of three shift supervisors.[1] In August 1989 financial difficulties forced the company into Chapter 11 bankruptcy proceedings. When work decreased significantly, Ms. Petrie's immediate superior, Jerry Crawford, the manager and general foreman, resigned from his job.[2]

In early 1990, Gerard Blankenship, the manager of customer service, assumed the position and responsibilities formerly held by Mr. Crawford. Ms. Petrie testified that she

1. As a supervisor and assistant supervisor, Ms. Petrie testified, she had the authority to fire employees under her supervision or "relieve[·] them of their position" if they were insubordinate or failed to do their jobs properly.

2. One of Mr. Crawford's duties as manager and general foreman was to supervise the three shift

supervisors, including Ms. Petrie. She testified that she had a "very good" professional relationship with Mr. Crawford for more than five years, and that before Crawford's resignation she was treated well by her employer and enjoyed her work. Her difficulties with her employer arose after Crawford left.

was upset by this change because she had not been informed of it, and because Mr. Blankenship immediately reorganized the typesetting department, even though he lacked any typesetting experience. When other employees complained to her about the changes, she told Blankenship about their complaints, but "he just didn't seem to care." Ms. Petrie's problems with Mr. Blankenship increased when he made derogatory remarks about her gender and her appearance in front of co-workers.[3] She also said that Blankenship intentionally undermined her authority in the presence of subordinates and encouraged other employees to do likewise.[4] Ms. Petrie was further upset by the fact that Mr. Blankenship operated his own printing business on the side, but on company time.[5]

Ms. Petrie's testimony was corroborated by George Chen, a former shift supervisor and co-worker. Mr. Chen testified that Blankenship intentionally harassed Ms. Petrie, called her demeaning names and made offensive remarks, and coaxed other employees to subvert her authority.[6] He also confirmed that Blankenship was performing outside private work on the employer's premises, and said that Blankenship had offered him $300 a week under the table to assist in this enterprise.

Young called Gerard Blankenship and George Berger, another shift supervisor, to testify on its behalf. Mr. Blankenship denied making demeaning and offensive remarks to Ms. Petrie, harassing her, or encouraging other employees to do so. He said that his friendship and professional relationship with Ms. Petrie had deteriorated because of changes in Young's management structure brought on by the resignation of Mr. Crawford and by the company's financial difficulties. He also testified that Ms. Petrie had a chronic absenteeism problem and that she had become an overbearing supervisor who was instigating problems with other employees. Mr. Blankenship admitted that he conducted his own printing business on the side, but explained that his employer condoned it because he was printing in an unrelated field.[7]

Mr. Berger testified that Blankenship never used derogatory or offensive remarks toward or about Ms. Petrie while in his presence, and that Ms. Petrie never complained to him about any harassment. He did concede, however, that another employee had used a derogatory nickname to refer to Ms. Petrie behind her back. Berger also acknowledged that some employees, including himself, did personal print jobs on company time, but he did not know whether Mr. Blankenship had done so.

There was conflicting medical testimony as to whether Ms. Petrie's psychiatric problems arose out of, and occurred in the course of, her employment. After going on sick leave in March 1990, Ms. Petrie sought medical treatment from Dr. Leopoldo Cintron–Oliver,

---

**3.** Ms. Petrie testified that Mr. Blankenship made comments to her such as "All you women are alike, you're dumb," or "All you women are only good for one thing." She also said that Blankenship called her, among other things, "L.A.B." or "lard-ass bitch," an epithet which he also encouraged other employees to use.

**4.** For example, Ms. Petrie recounted one incident in which she asked an employee, Wes Parsons, to do some copying. When Parsons failed to follow her instructions, Petrie went to him and asked him why. Parsons then put his finger on her nose and said, "I don't have to [expletive] listen to you, you lard-ass bitch, and I don't have to do any [expletive] thing that you say." When she tried to fire Parsons, she was overruled by Mr. Blankenship.

**5.** According to Ms. Petrie, Blankenship approached her and asked her to assist him with some of his personal printing projects. When

she refused, Blankenship's harassment of her increased.

**6.** In addition to the name-calling, Mr. Chen described conduct by Mr. Blankenship that seemed to be intended to harass and annoy Ms. Petrie, such as playing the company television too loud, allowing male employees to use the women's rest room, and closing a folding door between offices just far enough so that thinner employees could get through, but Ms. Petrie could not. Mr. Chen also testified that he himself had been subjected to derogatory remarks about his Asian heritage while working for Young.

**7.** Contrary to Mr. Chen's testimony, Mr. Blankenship denied making under-the-table offers to other employees. He also said that he did not have to sign an agreement, which other employees had said they were required to sign, that forbade him from doing printing work other than Young's.

a psychiatrist. Dr. Cintron–Oliver testified that Ms. Petrie was suffering from an adjustment reaction that resulted from a hostile work environment. He concluded that her emotional condition was directly attributable to the various forms of harassment to which she was subjected at work. Dr. Cintron–Oliver also stated that Ms. Petrie's condition would persist if she continued to work for Young.

Dr. Brian Schulman, a psychiatrist, testified on behalf of the employer. He had written a report on Ms. Petrie after conducting an independent medical evaluation and reviewing Dr. Cintron–Oliver's treatment records.[8] In that report Dr. Schulman diagnosed Ms. Petrie as suffering from clinical depression that was neither precipitated, aggravated, nor accelerated by her work environment.[9] Dr. Schulman disagreed with the diagnosis of job-related stress because Ms. Petrie was no longer exposed to the stressful work situation, yet her condition had not improved. Instead, he concluded that Ms. Petrie's clinical depression preceded the events at work and opined that it might have been brought on by her history of alcohol abuse, the death of her father, and her divorce.

On cross-examination, Dr. Schulman conceded that if Ms. Petrie had in fact been harassed significantly, if she had been the object of overt hostility from her supervisor, or if her authority had been undermined, then it would be normal for her to feel "discouraged" and "victimized" by her work environment. However, Dr. Schulman remained adamant that Ms. Petrie's psychological problems existed before the alleged incidents at work and that they manifested themselves only when work dropped off dramatically because of the company's financial difficulties.

In his compensation order on remand, the hearing examiner rejected the testimony of Dr. Schulman, calling it "contradictory, speculative, and conclusory." The examiner gave several reasons for his disbelief of Dr. Schulman's medical opinion. First, when Dr. Schulman examined Ms. Petrie, he was unaware of all the allegations of harassment, profanity, and abuse about which she had testified at the hearing. Second, despite his assertion that Ms. Petrie's psychological problems were of long standing, the doctor had conceded that persons who had to work in such a hostile environment "might feel victimized and discouraged by their circumstances." Finally, the examiner found Dr. Schulman's testimony less persuasive than Dr. Cintron–Oliver's because Schulman's conclusion that Ms. Petrie suffered from a chronic emotional difficulty was an assumption based only on past events in her life. In contrast, the examiner noted that Dr. Cintron–Oliver had examined Ms. Petrie over a period of six to seven months, and that his testimony was corroborated by that of her co-workers. Thus the hearing examiner concluded that the actual conditions at work caused or contributed to Ms. Petrie's emotional injury, and that they could have done so even in a person not predisposed to such injury.

## II

The standards governing our review of any administrative order are well settled. "Review by this court of administrative agency decisions, including those under the workers' compensation act, is limited." *Sturgis v. District of Columbia Department of Employment Services*, 629 A.2d 547, 551 n.

8. Dr. Schulman also gave Ms. Petrie a personality profile test called the Minnesota Multiphasic Personality Inventory (MMPI). This test is objective and scored by a computer, and, according to Dr. Schulman, it confirmed his own earlier evaluation. Dr. Schulman testified that the results from the MMPI indicated that Ms. Petrie fit the profile of a person with a long-standing personality disorder with alcohol or drug abuse as a prominent feature. According to Dr. Schulman, Ms. Petrie had "a drinking history" and was "evasive of how much she drinks...."

9. Dr. Schulman reached this conclusion even though Ms. Petrie had attributed her problems to a number of factors at work. He did say, however, that Ms. Petrie's depression appeared to have originated in the past sixteen months because he felt that it was the unstable work environment resulting from the bankruptcy proceedings that had affected her the most.

3 (D.C.1993) (citation omitted). "We cannot retry the facts or rehear the evidence. Our task is simply to determine whether there is substantial evidence to support the decision of the Department.... If there is, our consideration of the case is at an end." *Shepherd v. District of Columbia Department of Employment Services,* 514 A.2d 1184, 1186 (D.C.1986) (citations omitted). Guided by these principles, we address each of petitioners' arguments in turn.

## A. *Reopening the record*

Petitioners first contend that the hearing examiner's refusal to reopen the record in order to take additional testimony was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." D.C.Code § 1–1510(a)(3)(A) (1992). In particular, petitioners assert that they were "surprised" to learn at the administrative hearing of the specific nature of the vulgarities to which Ms. Petrie was subjected. In light of this unexpected discovery, petitioners argue that the examiner should have granted their motion to reopen the record.

The District of Columbia workers' compensation statute provides, however, that "no additional information may be submitted by the claimant or other interested parties after the date of hearing, except under unusual circumstances as determined by the Mayor." D.C.Code § 36–320(c) (1993); *see Jones v. District of Columbia Department of Employment Services,* 584 A.2d 17, 18 (D.C.1990); *King v. District of Columbia Department of Employment Services,* 560 A.2d 1067, 1071 (D.C.1989); *Porter v. District of Columbia Department of Employment Services,* 518 A.2d 1020, 1023 (D.C.1986). Pursuant to the statute, DOES has promulgated regulations, one of which states in part:

> If the Hearing ... Examiner believes that there is relevant and material evidence available which has not · been presented at the hearing, the hearing may be adjourned or, at any time prior to filing of the compensation order, the hearing may

be reopened for the receipt of the evidence.

7 DCMR § 223.4 (1986).

In *Jones, supra,* this court resolved apparent discrepancies between this regulation and the governing statute by holding that the reopening of evidentiary hearings is a two-step process. "First, there must be the showing of unusual circumstances, and only then can the hearing be reopened for material and relevant evidence." 584 A.2d at 19. We observed that the purpose of the regulation is to prevent a hearing from being reopened simply for the purpose of introducing new or additional evidence when that evidence "could have reasonably been presented at the hearing." *Id.* (citing J. STEIN, G. MITCHELL & B. MEZINES, ADMINISTRATIVE LAW § 30.01, at 30–11 (1990)).

■ Given our decision in *Jones,* we hold in this case that petitioners have failed to demonstrate any unusual circumstances that would justify reopening the record. Contrary to their argument, any relevant and material evidence in their possession "could have reasonably been presented at the hearing." The Director of DOES, in her remand order, properly rejected the employer's claim of surprise by noting that the employer "had ample opportunity through preliminary discovery ... to probe any unresolved or murky questions of fact it had with the case." The fact that Ms. Petrie did not particularize the abusive language and humiliating incidents in her deposition or in the course of her examination by Dr. Schulman does not permit a finding of unusual circumstances.[10] We agree with the Director's statement in the remand order that to reopen a hearing "merely because one [party] failed to thoroughly investigate the circumstances, facts, and other pertinent information related thereto, is an insufficient basis for granting the request under the rubric of 'unusual circumstances.'" The record reveals no unusual circumstances, as required by the statute

---

**10.** While the employer's counsel did ask Ms. Petrie during her deposition to state "exactly what the problems were," she gave a few examples of management changes and then said, more generally, "[E]very decision I would make was vetoed, and I was totally embarrassed and everything in front of my subordinates all the time." Counsel did not ask a follow-up question or seek in any way to have her clarify this answer.

and the *Jones* case, and thus we hold that the examiner's refusal to reopen the record was neither arbitrary nor capricious, nor an abuse of discretion, nor contrary to law.

## B. *Credibility*

■ Petitioners maintain that the hearing examiner erred in finding Ms. Petrie to be a credible witness. In his compensation order on remand, the hearing examiner said, "In weighing [the] evidence, I find and accept as more persuasive the claimant's testimony that the actual conditions at work caused or contributed to claimant's emotional injury." According to the hearing examiner, Ms. Petrie's testimony was more compelling than the employer's because it was corroborated by Mr. Chen, Mr. Berger, and the medical evidence. The examiner noted that other shift supervisors were also upset with the changes in the employer's procedures, and that Mr. Chen had also been the subject of derogatory remarks.

■ In *Dell v. District of Columbia Department of Employment Services*, 499 A.2d 102 (D.C.1985), this court reiterated a "well-established principle[ ] of administrative law" regarding credibility determinations made by a hearing examiner:

> Traditionally, a hearing examiner's decision has been entitled to greater consideration if the examiner, as in this case, has heard live testimony and observed the demeanor of the witnesses. "The significance of [the hearing examiner's] report ... depends largely on the importance of credibility in the particular case." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951). Stated differently, the decisions of a hearing examiner are to be "given special weight when they depend upon demeanor of witnesses." 3 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 17.16, at 330 (2d ed. 1980). This court has also recognized the "general rule that on credibility questions, the fact-finding of hearing examiners is entitled to great weight...." *In re Dwyer*, 399 A.2d 1, 12 (D.C.1979)....

*Id.* at 106; *accord, e.g., Gunty v. Department of Employment Services*, 524 A.2d 1192, 1197 (D.C.1987) (citing *Dell* ); *George Hyman Construction Co. v. District of Columbia Department of Employment Services*, 498 A.2d 563, 566 (D.C.1985) ("A hearing examiner's decisions are especially weighty when they involve credibility determinations," citing *Dell* ); *Arthur v. District of Columbia Nurses' Examining Board*, 459 A.2d 141, 146 (D.C.1983) (citing *In re Dwyer, supra* ).

In light of these and other precedents, we see no reason to disturb the hearing examiner's finding that Ms. Petrie was a credible witness. Credibility determinations are exclusively within the domain of the fact-finder, and in this case, as in all cases, the examiner's personal observation of the demeanor and conduct of the witnesses is entitled to great weight. Moreover, the hearing examiner's compensation order on remand includes a thorough and meticulous summary of the testimony of all the witnesses, which indicates that Ms. Petrie's testimony was carefully weighed in light of all the other evidence. Thus there is no basis in the record for us to overturn the examiner's credibility finding.

## C. *Compensable injury*

■ Petitioners' remaining argument is that the hearing examiner's finding that Ms. Petrie's disability arose out of and in the course of her employment is not supported by substantial evidence nor in accordance with law. They point to the fact that the hearing examiner never made an express finding on the credibility of Mr. Blankenship, who denied harassing Ms. Petrie, and assert that the opinions of the medical experts do not corroborate Ms. Petrie's allegations of verbal abuse. Petitioners also maintain that Ms. Petrie's authority was not undermined because she never had the power to fire employees in the first place (although her testimony was explicitly to the contrary). Finally, petitioners assert that the hearing examiner's finding that the "conditions of the claimant's employment were capable of causing a similar injury in a person not predisposed to injury" was not supported by the record.

■ To be compensable under the workers' compensation act, an injury must

be either "an 'accidental' injury that 'arise[s] out of and in the course of employment' or an 'occupational disease or infection' that 'arises naturally out of such employment or as naturally or unavoidably results from such accidental injury.'" *Sturgis, supra,* 629 A.2d at 551 (quoting *McEvily v. District of Columbia Department of Employment Services,* 500 A.2d 1022, 1023 n. 2 (D.C.1985)); *see also* D.C.Code § 36–301(12) (1993) (defining "injury"). It is well settled that emotional injuries resulting from job stress are, in appropriate circumstances, compensable "accidental injuries" under the statute. In *Dailey v. 3M Co.,* H & AS No. 85–259 (Final Compensation Order May 19, 1988), the Director of DOES established a special standard to be applied in workers' compensation cases involving emotional injury allegedly caused by job stress, and in *Spartin v. District of Columbia Department of Employment Services,* 584 A.2d 564 (D.C.1990), we adopted the *Dailey* formulation. In *Dailey* the Director said:

> [I]n order for a claimant to establish that an emotional injury arises out of the mental stress or mental stimulus of employment, the claimant must show that actual conditions of employment, as determined by an objective standard and not merely the claimant's subjective perception of his working conditions, were the cause of his emotional injury. The objective standard is satisfied where the claimant shows that the actual working conditions could have caused similar emotional injury in a person who was not significantly predisposed to such injury. .

*Dailey* at 6 (footnote omitted), quoted in *Spartin, supra,* 584 A.2d at 568. In other words, the pertinent question is "whether the stresses of the job were so great that they could have caused harm to the average worker." *Id.* at 569. Thus Ms. Petrie is entitled to compensation benefits if she was "exposed to work conditions so stressful that a normal employee might have suffered similar injury." *Id.* at 570; *accord, e.g., Sturgis, supra,* 629 A.2d at 552.

Contrary to petitioners' contention, this is not a case "where a worker imagines events or conditions at work which while real to the worker would appear to be mere figments of the worker's imagination to a neutral objective and reasonable person." *Dailey, supra,* at 12 n. 4. Instead, there was ample evidence that Ms. Petrie was subjected to a very real pattern of abuse and harassment while working for Young. Petitioners concede in their brief that Ms. Petrie was faced with "insubordination of employees" and the "countermanding of instructions by her supervisor," but they contest the hearing examiner's finding that she was also exposed to severe verbal abuse and harassment. We disagree. The testimony of Ms. Petrie, Mr. Chen, and even the employer's own witness, Mr. Berger, shows that sexist slurs and obscene remarks were directed to Ms. Petrie or were made about her by her co-workers. This same testimony also establishes that Mr. Blankenship and other employees intentionally sought to harass and abuse Ms. Petrie, and that when Mr. Chen, for example, refused to go along with Blankenship's campaign, Chen himself was subjected to abuse. Ms. Petrie also testified that before March 1990, when she first went on sick leave, she had never had any psychiatric treatment for any emotional disorder, nor had any doctor ever prescribed for her any medication for emotional or psychological stress. Given the employer's concession that some employees were intentionally insubordinate and that Ms. Petrie's instructions were countermanded, we are satisfied that the hearing examiner could reasonably find from all the evidence, as he did, that "the actual conditions of the workplace could have caused a similar emotional injury in a person who was not significantly predisposed to such injury." [11]

---

11. We expressly reject petitioners' contention that the examiner erred in failing to make a finding on the credibility of Mr. Blankenship. "Our decisions do not require hearing examiners to inventory the evidence and explain in detail why a particular part of it is accepted or rejected." *Sturgis, supra,* 629 A.2d at 554 (citation omitted); *see Citizens Ass'n of Georgetown v. District of Columbia Zoning Comm'n,* 402 A.2d 36, 47 (D.C.1979) (when findings are supported by sufficient evidence, agency is not "required to explain ... why it favored one witness ... over another"). In any event, the examiner did find

The final order granting Ms. Petrie's claim for workers' compensation benefits is therefore

*Affirmed.*

Ms. Petrie's testimony "more persuasive," which necessarily means that he found Mr. Blankenship's contrary testimony less persuasive, *i.e.*, less credible.