**Katherine L. OLSON, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPART-MENT OF EMPLOYMENT SER-VICES, Respondent,**

**Georgetown University Hospital and Fireman's Fund Insurance Company, Intervenors.**

**No. 98–AA–41.**

District of Columbia Court of Appeals.

Argued Feb. 16, 1999.

Decided Sept. 2, 1999.

---

Laura V. Berthiaume, Rockville, MD, for petitioner.

Michael D. Dobbs for intervenors.

JoAnne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reis-

chel, Deputy Corporation Counsel, filed a statement in lieu of brief, for respondent.

Before FARRELL and RUIZ, Associate Judges, and GALLAGHER, Senior Judge.

RUIZ, Associate Judge:

The sole issue presented by this appeal is whether petitioner, Katherine L. Olson, is entitled to temporary total disability benefits from September 16, 1996 to the present and continuing, as well as payment for all causally-related medical expenses, as a result of a June 14, 1993 hip injury she suffered while working as an intensive care nurse.[1] The Department of Employment Services (DOES) denied Olson's claim for benefits on the ground that her "current disability" was not causally related to her work injury.[2] Olson contends on appeal that the agency failed to make basic findings of fact on all material issues and to consider all of the evidence in the record. Upon review of the record, we affirm the agency's denial of petitioner's claim for temporary total disability benefits stemming from the Achilles tendinitis, but remand to the agency with instructions to conduct a more thorough evidentiary review on the issue of whether and to what extent Olson is entitled to disability benefits as a result of her ongoing S1 radiculopathy.

**I.**

On June 14, 1993, Olson, an intensive care nurse at Georgetown University Hospital, injured her left hip when she struck the corner of a wall while transporting a patient by stretcher to a CT scan. Following the accident, Olson's hip was bruised, but she did not immediately feel any pain in her left leg. Within a few days, however, she began to feel shooting pains radiating from her left hip to her left leg with numbness in the left leg. Olson did not report to work the day after she started experiencing pain and numbness in her left leg and was unable to return to her job as an intensive care nurse thereafter.[3]

Olson first saw Dr. Rosenberg, a rheumatologist, who diagnosed a left L5/S1 radiculopathy[4] due to the work-related injury.[5] In his treatment notes, Dr. Rosenberg stated that Olson had a history of tendinitis and low back pain. Additionally, he referred to Olson's intermittent left lumbar radiculopathy and indicated that, following an incident fifteen years earlier when Olson fell down steps and suffered a coccyx fracture, she also has had intermittent sciatic symptoms bilaterally. Further, he noted that two months prior to the incident alleged to have caused the disability in this case, Olson had noticed the return of the bilateral sciatic symptoms.

---

1. *See* District of Columbia Workers' Compensation Act, D.C.Code § 36–301 *et seq.* (1997).

2. On October 3, 1997, a hearing examiner denied Olson's claim for relief and petitioner filed a timely petition for review with the Director. After the Director did not rule on Olson's internal appeal within the 45–day deadline, the compensation order became final for the purpose of judicial review. *See* D.C.Code § 36–322(b)(2) (Director's decisions "shall be rendered within 45 days from the date of the application .... If a final decision is not rendered within such 45–day period the compensation order shall be considered a final decision for the purposes of appeal [to the District of Columbia Court of Appeals].").

3. Georgetown Hospital, Olson's employer, paid voluntary temporary total disability benefits to petitioner from June 14, 1993 until May 11, 1994, when it reduced its payments to temporary partial disability benefits after

Olson obtained employment as a medical auditor.

4. "Radiculopathy" is defined as a "disease of the nerve roots." DORLAND'S MEDICAL DICTIONARY 1109 (26th ed.1981). The L5/S1 designation refers to particular nerve roots in the lumbar and sacral areas of the spinal cord. *See* George Matook, M.D. & Joseph Brown, Fractures and Dislocations of the Thoracic and Lumbar Spine, in 4 ATTORNEYS' TEXTBOOK OF MEDICINE §§ 13A.01, –.01 (8), –.13 (3) (Roscoe N. Gray, M.D. & Louise J. Gordy, M.D. ed.1991).

5. Olson had seen Dr. Rosenberg once previous to her work injury, in March 1992, when he diagnosed chronic left Achilles tendinitis and left forefoot pain and prescribed medication for treatment.

Olson was a patient of Dr. Rosenberg[6] until she was referred by her insurance company to Dr. Spiegel, an osteopath, for follow-up care.[7] At the initial consultation on November 12, 1993, Olson did not inform Dr. Spiegel that she had had prior back and sciatica problems or that she had received treatment for her Achilles tendon from Dr. Rosenberg.[8] Dr. Spiegel diagnosed "left sacroiliac joint dysfunction" resulting from the work injury and monitored Olson while she participated in a rehabilitation program which included work-hardening, physical therapy and vocational rehabilitation.[9] Dr. Spiegel also administered numerous sacroiliac injections in the S1 joint.

On March 5, 1994, Olson began vocational rehabilitation after Dr. Spiegel determined that she would be physically unable to return to her job as an intensive care nurse. On May 11, 1994, she obtained a part-time job auditing medical records in several Maryland counties.[10] Olson held this part-time job until September 16, 1996, when she developed acute Achilles tendinitis and was unable to continue working. Although Dr. Spiegel determined that the Achilles tendinitis resulted

from an altered gait caused by the S1 radiculopathy, Georgetown terminated all worker's compensation benefits as of September 16, 1996.

In October 1996, Olson began using a cane for persistent left leg numbness.[11] The Achilles tendon improved by December 19, 1996, but Olson continued to experience radicular pain and sacroiliac joint dysfunction. Dr. Spiegel ordered electrodiagnostic studies and advised Olson not to return to work. On December 31, 1996, Dr. Ammerman reexamined Olson and found that she had "evidence of residual left S1 radiculopathy," but did not appear "disabled from returning to her medical auditing activity." Dr. Ammerman also informed Olson's insurance company that her recent bout with Achilles tendinitis was not related to the June 1993 work injury. Following the electrodiagnostic studies which revealed left S1 radiculopathy, Dr. Spiegel recommended several S1 nerve blocks and again advised Olson not to return to work. After the nerve blocks failed to alleviate the pain, Dr. Spiegel referred Olson to Dr. Michaels, an ortho-

---

6. During the time Dr. Rosenberg treated Olson, he referred her to Dr. Schwartz for a neurological consultation. Olson saw Dr. Schwartz once, on July 21, 1993, when he recommended a CT scan with a myelogram to determine whether she had a herniated disc. The tests indicated that Olson did not have a herniated disc.

7. On September 22, 1993, Olson also was evaluated by Dr. Ammerman, at her employer's request. After reviewing test results and performing a physical exam, Dr. Ammerman diagnosed Olson as having "resolving post traumatic left S1 radiculopathy." Based on Olson's report that she had no prior history of similar symptoms, Dr. Ammerman concluded that Olson's work incident produced the lumbar radiculopathy. Further, Dr. Ammerman recommended that Olson return to limited, full-time duty within thirty days, avoiding repeated bending, stooping or lifting of more than 15 to 20 pounds.

8. At the hearing, Olson explained why she did not inform Dr. Spiegel that she had been treated for achilles tendon pain in the past

I may not have [informed Dr. Spiegel] because it was not something that had made any type of impression on me before. It was not something that I had dwelled upon and it was not some [sic] that I would have marked on my calendar and said I had tendinitis this month or this year.

9. Olson also did not inform her physical therapist about her prior back problems. At the initial physical therapy consultation on August 30, 1995, the physical therapist noted that, prior to 1993, Olson had "no lumbar spine or leg problems."

10. While employed as a medical auditor, Olson received temporary partial disability benefits from Georgetown.

11. Dr. Spiegel's October 17, 1996 treatment notes state that Olson had difficulty ambulating without a cane or wheelchair. The notes also indicate that Olson's underlying history of chronic sacroiliac joint problems, stemming from a worker's compensation injury, is probably "the root of the over-use injury, 'the Achilles tendinitis.' "

paedic surgeon, for a surgery consultation.[12]

On March 4, 1997, Dr. Michaels recommended a lumbar myelogram and a post-myelogram CT scan which revealed some degenerative disease, but no evidence of disc herniation. On May 12, 1997, Dr. Michaels reevaluated Olson and decided against surgical fusion, but suggested an implantable stimulator to manage her persistent lower back pain and intermittent leg pain. Dr. Michaels also stated that there was "no question" that Olson was unable to work as an intensive care nurse. Following Dr. Michael's surgery consultation, Dr. Ammerman reevaluated Olson and determined that, while she still had "residuals"' of S1 radiculopathy, she was not disabled from nonarduous employment.[13]

At the July 21, 1997 hearing, the parties stipulated that Olson sustained a work-related injury and gave timely notice to her employer, and that Georgetown made voluntary temporary total and temporary partial disability payments to Olson during the period of June 14, 1993 to September 16, 1996. Olson also testified that, prior to her hip injury, she had not experienced any symptoms similar to the numbness and constant pain she has experienced since the injury.[14] After the hearing, the record remained open until August 18, 1997, during which time both parties submitted additional medical records. Olson submitted a letter from Dr. Michaels in which he reported "within a reasonable degree of medical certainty" that Olson's symptoms were directly related to her June 1993 work injury.[15] He further recommended "sedentary work" as long as driving time was restricted and lifting charts and sitting for long periods of time could be avoided.[16] Georgetown submitted a letter from Dr. Ammerman stating that he had been unaware of Olson's prior history of lower extremity symptoms which suggested that her lumbar radiculopathy long pre-dated the June 1993 work incident.[17] He also stated that Olson's past

12. In late March 1997, Dr. Spiegel also referred Olson to Dr. Dounis, a pain management physician, to evaluate the option of implanting a stimulator to ease the pain. On April 29, 1997, Dr. Dounis wrote a letter to Olson's insurer stating that Olson exhibited S1 radiculopathy symptoms. Additionally, he outlined Olson's treatment history, noting that she had had little response to epidural steroid injections and oral medications and only temporary relief as a result of the S1 nerve root blocks. Dr. Dounis requested pre-authorization to proceed with the trial of a spinal cord stimulator to see if any relief would result from this technique. Although Dr. Dounis stated in the letter that he "ha[d] been seeing Ms. Olson for control of her radicular pain," it is unclear from the record how many appointments Olson had with Dr. Dounis.

13. In his report, Dr. Ammerman stated, "It is difficult to relate the significant degree of complaint to a not particularly impressive neurologic examination and negative myelogram and CT."

14. At Olson's pre-hearing deposition she answered "no," when asked whether she had had any prior "injuries" to her left leg, left foot, left ankle, left hip and back. At the hearing, Olson clarified that while she had not suffered any prior "injuries" to any of the mentioned body parts, she had obtained "treatment" for pain in these body parts.

She further stated that she defined an "injury" as "[s]omething that happens to you that may cause a condition or pain," such as a car accident or a fall.

15. Dr. Michaels also indicated that he was aware that Olson had had episodes of transient lower back pain and sciatica prior to her work injury, but stated further that "her current symptoms clearly date to her accident in June of 1993."

16. Dr. Michaels stated specifically that he did not think Olson could routinely commute to and from Baltimore, a requirement for her job as a medical auditor, and that she would not be able to lift more than 10 pounds on a regular basis. He indicated further that Olson should not bend to lift and should have frequent stretch breaks to relieve tension in her lower back.

17. Although Dr. Ammerman stated in the 1997 letter that he was unaware of Olson's prior back problems when he made his initial diagnosis in 1993, the September 22, 1993 letter in which he made the initial diagnosis references a "lumbar MRI scan performed 2 June 1993" which was ordered by Dr. Rosenberg. This reference suggests that Dr. Ammerman had access to Dr. Rosenberg's treatment notes wherein Dr. Rosenberg referenced Olson's prior history of back problems.

history of such symptoms raised questions "regarding any contribution of the 6/19/93 event and the patient's lumbar radiculopathy."

In denying Olson's benefits claim, the agency framed the issue as "whether [Olson's] Achilles tendinitis is medically causally related to the work injury of June 14, 1993." While recognizing the presumption of compensability, *see* D.C.Code § 36–321(1), the agency concluded that Georgetown had offered evidence sufficient to rebut the presumption that Olson's Achilles tendinitis was triggered by her 1993 work injury and denied her claim for relief. Although the compensation order also suggests that Olson's "current disability" is not causally related to the 1993 work injury, the order does not define "current disability," nor does it explicitly address Olson's claim that her ongoing S1 radiculopathy can be traced to the 1993 work injury.

## II.

■■■ Under our "limited" review of agency decisions, we must affirm unless we conclude that the agency's ruling was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. D.C.Code § 1–1510(a)(3) (1999); *Charles P. Young Co. v. District of Columbia Dep't of Employment Servs.*, 681 A.2d 451, 455–56 (D.C.1996). If there is substantial evidence in the record as a whole to support the decision of the Department, then " 'our consideration of the case is at an end.' " *Id.* at 456 (quoting *Shepherd v. District of Columbia Dep't of Employment Servs.*, 514 A.2d 1184, 1186 (D.C.1986)). "Substantial evidence means 'more than a mere scintilla' and such that reasonable minds might accept [ ] as adequate to support a conclusion." *Dominique v. District of Columbia Dep't of Employment Servs.*, 574 A.2d 862, 866 n. 3 (D.C.1990) (quoting *Vestry of Grace Parish v. D.C. Alcoholic*

*Beverage Control Bd.*, 366 A.2d 1110 (D.C. 1976)).

### A. *Achilles Tendinitis.*

Olson challenges the agency's conclusion that the Achilles tendinitis she suffered between September 16, 1996 and December 19, 1996, was not causally related to her work injury. Petitioner asserts that this conclusion is based on an incorrect reading of the facts and is not supported by substantial evidence in the record. In denying Olson's claim for benefits, the agency relied on the fact that she suffered Achilles tendinitis prior to her 1993 work injury.[18] After determining that neither the physical therapist nor Dr. Spiegel were aware of Olson's pre–1993 history of tendinitis, the agency discredited Dr. Spiegel's opinion that Olson's Achilles tendinitis was related to the 1993 work injury. The hearing examiner reached the conclusion that Dr. Spiegel was not aware of Olson's pre–1993 Achilles tendinitis from the fact that it was not mentioned in the August 30, 1995 physical therapy report, signed by the physical therapist and written on Dr. Spiegel's letterhead, which stated that prior to 1993, Olson "had no lumbar spine or leg problems, apart from a right knee injury at work which resulted in arthroscopic surgery." While the agency discredited Olson's testimony that she had obtained "treatment" for her left leg and foot prior to 1993, but had suffered no prior "injuries," it credited Dr. Ammerman's opinion that Olson's Achilles tendinitis was not related to the work injury.

■■■ Olson recognizes that the "[c]redibility determinations of a hearing examiner are accorded special deference by this court," *Teal v. District of Columbia Dep't of Employment Servs.*, 580 A.2d 647, 651 n. 7 (D.C.1990), but claims that the agency's factual finding—that Dr. Spiegel did not have her complete medical history—is not supported by substantial

---

**18.** Dr. Rosenberg's June 21, 1993 progress note indicated that Olson had a "history of tendinitis and lower back pain," and the rec-

ord shows that Olson was seen by Dr. Rosenberg for her Achilles tendinitis condition in 1992.

evidence. In particular, Olson takes issue with the hearing examiner's reliance on the August 30, 1995 physical therapy report, arguing that it does not show that Dr. Spiegel was unaware of her pre–1993 tendinitis. While it is true that the physical therapist, not Dr. Spiegel, signed the physical therapy report, the report is written on Dr. Spiegel's letterhead, lists Dr. Spiegel as the physician and is contained in Dr. Spiegel's records. Absent evidence to the contrary, it was reasonable for the examiner to infer, based on the physical therapy report and Dr. Spiegel's initial evaluation, which also makes no mention of Olson's past problems with Achilles tendinitis,[19] that Dr. Spiegel did not have a complete medical history when he attributed the tendinitis to Olson's 1993 work injury. *See George Hyman Constr. Co. v. District of Columbia Dep't of Employment Servs.*, 498 A.2d 563, 566 (D.C. 1985) (noting that the hearing examiner is entitled to draw reasonable inferences from the record). Moreover, Olson admitted at the hearing that she had not provided her complete medical history to either the physical therapist or Dr. Spiegel. Therefore, the hearing examiner's factual finding that Dr. Spiegel was unaware of Olson's pre–1993 Achilles tendinitis is supported by substantial evidence in the record as a whole. *See Charles P. Young Co., supra*, 681 A.2d at 456. Given Dr. Rosenberg's medical records, indicating Olson's history of tendinitis, and Dr. Am-

merman's fully informed-opinion that petitioner's Achilles tendinitis was not related to the 1993 work injury,[20] the trial court did not err in concluding that Georgetown proffered sufficient evidence to "sever the potential connection between [Olson's] Achilles tendinitis and her 1993 work injury."[21] *See Whittaker v. District of Columbia Dep't of Employment Servs.*, 668 A.2d 844, 845 (D.C.1995) (explaining that statutory presumption of compensability can be rebutted where employer offers evidence "'specific and comprehensive enough to sever the potential connection between a particular injury and a job-related event'") (quoting *Parodi v. District of Columbia Dep't of Employment Servs.*, 560 A.2d 524, 526 (D.C.1989)) (citations omitted.) Accordingly, we affirm the agency's decision to deny Olson's claim for temporary total disability benefits for the period of September 16, 1996 through December 19, 1996, when Olson was unable to work due to Achilles tendinitis.

### B. S1 Radiculopathy.

Olson maintains that, while her Achilles tendinitis and S1 radiculopathy may have overlapped between September and December 1996, the S1 radiculopathy has existed independently from September 1996 to the present and has prevented her from returning to her former employment, either as an intensive care nurse or as a medical auditor. Because the agency nar-

19. Dr. Spiegel's initial patient evaluation is dated November 12, 1993.

20. Additionally, as noted *supra*, we yield to the hearing examiner's decision to discredit both Olson's testimony, *see Teal, supra*, 580 A.2d at 651 (hearing examiner's credibility determinations accorded great deference), and the opinion of her treating physician, Dr. Spiegel. *See Canlas v. District of Columbia Dep't of Employment Servs.*, 723 A.2d 1210, 1211–12 (D.C.1999) (although treating physician's opinion entitled to great weight, opinion may be rejected if reasonable explanation given).

21. Olson cites *Brown v. District of Columbia Dep't of Employment Servs.*, 700 A.2d 787

(D.C.1997) for the proposition that mere failure to report a prior injury to a medical practitioner "is not the caliber of evidence required to meet the burden of overcoming the presumption of compensability." *Id.* at 793. However, in this case, unlike *Brown*, the agency did not rely solely on Olson's failure to inform Dr. Spiegel of her past history of tendinitis to rebut the presumption of compensability as there was additional evidence in the record supporting the examiner's conclusion that Georgetown had rebutted the presumption of compensability, namely Dr. Rosenberg's medical evaluation, listing Olson's past history of tendinitis, and Dr. Ammerman's opinion that Olson's recurring tendinitis originated prior to the 1993 work injury.

rowly framed the issue as whether Olson's 1996 bout of Achilles tendinitis was causally related to the 1993 work injury, the compensation order does not independently address Olson's claim that her "current disability," the ongoing S1 radiculopathy, is causally related to the 1993 work injury. The agency failed to examine the nature and extent of petitioner's S1 radiculopathy, apparently based on the assumption that if the Achilles tendinitis is not work-related, the ongoing S1 radiculopathy also cannot be work-related. In short, the compensation order suggests that Olson's post-September 1996 S1 radiculopathy is attributable to the Achilles tendinitis rather than to the original work injury. However, because the agency failed to support this conclusion with the required findings of fact, we are unable to conduct a substantial evidence review.

An agency is "required to make basic findings of fact on all material issues." *Brown, supra* note 21, 700 A.2d at 792 (citing *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n*, 426 A.2d 327, 334 (D.C.1981)). Otherwise, this court cannot determine "whether the agency's findings are supported by substantial evidence and whether those findings lead rationally to its conclusions of law." *Id.* (citations omitted). While the agency discounted Olson's testimony that her "present disability" is related to the original work injury,[22] it made no findings of fact on several important issues, namely whether Olson suffers from S1 radiculopathy and, if so, whether and to what extent she is disabled due to this condition. In addition, the agency did not expressly decide whether, if Olson is disabled, her disability relates back to the 1993 work injury or whether the Achilles tendinitis was in fact an intervening cause.[23] Because the agency failed to treat the S1 radiculopathy as a separate issue in the case, the findings of fact on this material issue are insufficient.

The intervenors contend that, because the agency found that Olson was not disabled from her job as a medical auditor as a result of the S1 radiculopathy, it was not required to reach the causation question. This argument is flawed. Even if Olson had returned to her job as a medical auditor after December 31, 1996, the date Dr. Ammerman determined she was no longer disabled from light-duty work, she still would have been entitled to permanent partial disability benefits if it was determined that her continued S1 radiculopathy related back to her work injury because the medical auditor job was part-time and paid less than her nursing job. Here, Georgetown discontinued payment of *all* worker's compensation benefits after September 16, 1996, the date Olson's Achilles tendinitis was diagnosed. The agency made an explicit finding that the Achilles tendinitis was not attributable to the original work injury after a review of pertinent evidence, but it bootstrapped a second conclusion onto the first—that Olson's lingering S1 radiculopathy was also not attributable to the work injury—without

---

22. In particular, the hearing examiner stated

I find [Olson's] testimony as it concerns the causal relationship of her *present disability* to the original work injury to be unworthy of belief. I find [Olson's] testimony to be internally inconsistent, evasive and obfuscatory, and at odds with the objective evidence of record.

(Emphasis added). Although the evidence in the record indicates that Olson's "present disability" is the lingering S1 radiculopathy, the hearing examiner does not define this term in the compensation order.

23. The hearing examiner does make other findings of fact related to the S1 radiculopathy, but these too are problematic. While the examiner's order notes that Olson's Achilles tendinitis resolved on December 19, 1996 and she was able to return to light duty work by June 30, 1997, it leaves open the question of whether Olson was disabled between December 19, 1996 and June 29, 1997 and, if so, whether Olson was entitled to benefits during that six-month period. The examiner also determined that after December 19, 1996, Olson voluntarily limited her income by not actively pursuing work "within her physical limitations," but failed to make a finding of fact as to whether Olson's auditing job during May–September 1996 was within those limitations.

making any findings of fact on this issue.[24] As the compensation order inadequately explores whether petitioner's S1 radiculopathy is a disability and, if so, whether this medical condition is causally related to the 1993 work injury, we remand to the agency to make the required findings of fact. *See* D.C.Code § 1–1509(e) (1999) (every decision rendered by an agency in a contested case must state findings of fact consisting of a "concise statement of the conclusions upon each contested issue of fact"); *George Hyman Constr. Co., supra,* 498 A.2d at 566 (noting that a hearing examiner's order must " 'state findings of fact on each material, contested factual issue' ") (quoting *Perkins v. District of Columbia Dep't of Employment Servs.,* 482 A.2d 401, 402 (D.C.1984)).

■ In addition, the agency must not only make adequate findings of fact on whether Olson is disabled by S1 radiculopathy, but must also indicate whether the S1 radiculopathy is related to the work injury and what, if any, evidence supports this conclusion. As noted by Olson, a Workers' Compensation claimant is entitled to a presumption that "the claim comes within the provisions" of the Act. D.C.Code § 36–321(1).[25] To benefit from this presumption, a petitioner must provide some evidence of 1) a disability and 2) a work-related event which could have resulted in or contributed to the disability. *See Whittaker, supra,* 668 A.2d at 845. Petitioner provided ample evidence to support the presumption through the opinions of Drs. Spiegel and Michaels. Since December 19, 1996, Dr. Spiegel has issued disability slips reflecting Olson's continued problems with S1 radiculopathy. Additionally, Dr. Michaels stated that "within a reasonable degree of medical certainty," Olson's continuing disability was work related. Although the agency recognized the presumption of compensability in the compensation order, it never explicitly applied this presumption to Olson's S1 radiculopathy claim.[26]

24. In the alternative, the intervenors claim that even if the hearing examiner erred by failing to make explicit findings of fact as to what caused Olson's S1 radiculopathy, *i.e.,* the June 1993 work injury or the Achilles tendinitis, this error is harmless since it is clear from the evidence cited that the hearing examiner would have found in favor of Georgetown on this issue. Although Georgetown cites several cases in support of this proposition, these cases deal only with agency evidentiary and procedural errors, not with the failure to make the required findings of fact, a requirement for judicial review. *See 4934, Inc. v. District of Columbia Dep't of Employment Servs.,* 605 A.2d 50, 57 (D.C. 1992) (hearing examiner's failure to force disclosure of settlement agreement harmless), *Regional Constr. Co. v. District of Columbia Dep't of Employment Servs.,* 600 A.2d 1077, 1078–79 (D.C.1991), *cert. denied,* 505 U.S. 1206, 112 S.Ct. 2997, 120 L.Ed.2d 873 (1992) (agency's failure to give "fair and adequate notice" of formal hearing is harmless error). Even if Georgetown is correct concerning the weight of the evidence, it is not our role to speculate regarding the findings of fact the hearing examiner *might have made* on this issue. *See Brown, supra* note 21, 700 A.2d at 792 (requiring agency to make findings of fact on all material issues before this court engages in substantial evidence review); *George Hyman Constr. Co., supra,* 498 A.2d at 566 (decisions must state findings of fact on each material issue).

25. This principle of law "was 'designed to effectuate the humanitarian purposes of the statute' and reflects a 'strong legislative policy favoring awards in arguable cases.' " *Parodi, supra,* 560 A.2d at 525–26 (quoting *Ferreira v. District of Columbia Dept't of Employment Servs.,* 531 A.2d 651, 655 (D.C.1987)). Therefore, "doubts as to whether the injury arose out' of the employment are resolved in the claimant's favor." *Baker v. District of Columbia Dep't of Employment Servs.,* 611 A.2d 548, 550 (D.C.1992).

26. The intervenors argue that the statutory presumption of compensability does not apply to the S1 radiculopathy claim because the hearing examiner found that Olson's S1 radiculopathy was not a "disability" under the statute and, therefore, there was no need to address causation. However, the agency made no finding of fact on this issue. Instead, it recognized Dr. Ammerman's opinion that, as of December 19, 1996, Olson was no longer disabled from her job as a medical records auditor. This finding does not preclude Olson from arguing that, notwithstanding the resolution of her Achilles tendinitis, she is still entitled to partial disability benefits because her lingering S1 radiculopathy relates back to the work injury and prevents her from working as an intensive care nurse.

■ On remand, the agency should give Olson the benefit of the presumption of compensability for her S1 radiculopathy claim and conduct a more focused inquiry as to whether Georgetown offered evidence "specific and comprehensive" enough to rebut the presumption.[27] *Whittaker, supra,* 668 A.2d at 845 ("'Absent employer evidence specific and comprehensive enough to sever the potential connection between a particular injury and a job-related event, the compensation claim will be deemed to fall within the purview of the statute.'") (quoting *Parodi, supra,* 560 A.2d at 526) (internal quotation & citation omitted). In the compensation order, the examiner discredits Olson's testimony regarding "the causal relationship of her present disability to the original work injury ..." because he finds that Olson failed to fully inform Dr. Spiegel or Dr. Ammerman[28] of her past medical history and concealed this past history in her prehearing deposition.[29] *See Teal, supra,* 580 A.2d at 651 n. 7 (explaining that "[c]redibility determinations of a hearing examiner are accorded special deference by this court"); *George Hyman Constr. Co., supra,* 498 A.2d at 566 (hearing examiner's decisions "especially weighty" when they involve credibility determinations). The agency also dismisses the opinion of Dr. Spiegel, the main treating physician, because it finds that Dr. Spiegel did not have Olson's complete medical history, namely information regarding her intermittent back and leg problems prior to the June 1993 injury. Although the opinion of a treating physician is ordinarily entitled to significant weight, *see Stewart v. District of Columbia Dep't of Employment Servs.,* 606 A.2d 1350, 1353 (D.C.1992), a hearing examiner may discount a treating physician's opinion if the examiner sets forth specific and legitimate reasons for doing so. *See Canlas, supra* note 20, 723 A.2d at 1211–12. In this case, the agency offered a specific reason for discounting Dr. Spiegel's opinion which is supported by the record.

■ After discounting Olson's testimony and Dr. Spiegel's opinion, the agency relied on Dr. Ammerman's opinion that Olson's Achilles tendinitis is not related to the June 1993 accident, but this statement does not go to the question of whether Olson's ongoing S1 radiculopathy is attributable to her work injury.[30] The examiner also referred to Dr. Rosenberg's treatment notes detailing Olson's prior history of back and leg problems; however, "[t]he presumption of compensability cannot be overcome merely by some isolated evidence." *Whittaker, supra,* 668 A.2d at 847 (internal quotation and citation omitted). Moreover, the agency failed to consider Dr. Rosenberg's opinion that, despite this prior history, the S1 radiculopathy is work related. Although Dr. Rosenberg's opinion would be moot should the agency find that the 1996 Achilles tendinitis severed any connection between the June 1993 injury and the current S1 radiculopathy,[31] Dr. Michaels' opinion would not.[32] The agency makes no mention of Dr. Michaels' opinion that "within a reasonable degree of

---

27. Once the statutory presumption is triggered, the burden of production shifts to the employer to set forth substantial evidence showing that the disability is not work related. *Ferreira, supra* note 25, 531 A.2d at 655 & n. 5.

28. But see note 17 *supra.*

29. See notes 8 and 14 *supra.*

30. In Dr. Ammerman's July 31, 1997 letter, he states that Olson's prior lumbar radiculopathy raises questions "regarding any contribution of the 6/19/93 event and the patient's lumbar radiculopathy." However, the hearing examiner does not explicitly rely on this piece of evidence in the compensation order and Dr. Ammerman does not suggest that he holds this opinion within a reasonable degree of medical certainty. One task of the agency on remand will be to state explicitly what weight it gives to Dr. Ammerman's opinion, and why.

31. Dr. Rosenberg stated this opinion in an August 24, 1993 letter, three years before Olson developed acute Achilles tendinitis.

32. Dr. Michaels gave his opinion in a letter dated July 30, 1997, well after petitioner's 1996 tendinitis had come and gone.

medical certainty[,]" Olson's S1 radiculopathy symptoms are "directly related to her work accident on 6–14–93." This opinion, from one of Olson's treating physicians, *see Stewart, supra,* 606 A.2d at 1353 (treating physician's opinion entitled to significant weight), was rendered with full knowledge of Olson's complete medical history. Based on this record, we remand to the agency with specific instructions to consider the evidence as a whole, including the opinions of Drs. Rosenberg and Michaels regarding the connection between Olson's 1993 work injury and her ongoing S1 radiculopathy.[33]

For the foregoing reasons, the agency's denial of Olson's benefits claim stemming from the 1996 Achilles tendinitis is affirmed, but we remand the case to the agency for further findings of fact regarding the S1 radiculopathy claim.

*So ordered.*

---

33. Should the agency conclude that petitioner's lingering S1 radiculopathy is a disability within the meaning of the Workers' Compensation Act, D.C.Code §§ 36–301 *et seq.,* it must also address the remaining issues, *i.e.,* the nature and extent of Olson's disability and whether Olson voluntarily limited her income by not returning to work after the resolution of her Achilles tendinitis.