Shelda KRALICK, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent.

No. 03–AA–153.

District of Columbia Court of Appeals.

Argued Jan. 7, 2004.
Decided Feb. 26, 2004.

Daniel R. Long, of the bar of the State of California, pro hac vice, Napa, CA, by special leave of court, for petitioner.

William J. Earl, Assistant Corporation Counsel, with whom Robert J. Spagnoletti, Acting Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel at the time the brief was filed, were on the brief, for respondent.

Before RUIZ, REID, and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge:

As a result of the back injury petitioner Shelda Kralick sustained in a slip-and-fall accident outside her workplace in 1979, petitioner received temporary total disability benefits from the District of Columbia until 1990, when those benefits were terminated. After petitioner sought review of the decision to terminate her benefits, the decision was affirmed by the Director of the Department of Employment Services ("DOES"). On appeal from that decision, petitioner advances two related arguments: (1) that the Director's findings were not supported by substantial evidence, and (2) that both the Hearing Officer and the Director improperly failed to give deference to the testimony of her treating physician over that of two doctors retained by the District for litigation purposes. Because the decision to reject the testimony of petitioner's treating physician was based on an error of fact, we reverse and remand this case to the Director for further consideration.

## Factual Background

Petitioner was hired by the District of Columbia in 1974 to work as a computer programmer for the District of Columbia Superior Court. On February 21, 1979, petitioner slipped on the ice and snow in front of her job site and fell, injuring her lower back. On the basis of this injury, petitioner was granted temporary total disability compensation benefits, and, to this date, she has not returned to work.

At the time of her injury, petitioner was twenty-eight years old, 5'5" tall and weighed more than 240 pounds.

The record reflects that petitioner visited a number of doctors in the years following her injury. On the day of her fall, orthopedic surgeon Dr. Robert Collins diagnosed petitioner with an acute lumbar strain and directed her to rest at home for the remainder of the week. Because she continued to complain of severe back pain, Dr. Collins admitted petitioner to Washington Hospital Center on March 5, 1979, where she was placed in traction until March 30. While in the hospital, petitioner was examined by neurosurgeon Dr. Arthur P. Hustead who opined that she had sustained a possible ruptured disc from the fall and recommended that she undergo a myelogram[1] to determine whether surgery was necessary. When the results of the myelogram came back negative for signs of disc damage, Dr. Hustead concluded that petitioner had a lumbar strain and that surgery was unnecessary. A second myelogram was performed in September 1981, again yielding normal results.

Although Petitioner was treated primarily by Dr. Collins during the early 1980's, she underwent diagnostic procedures with a number of other specialists. Orthopedist Dr. Jack Nichols examined petitioner on two occasions in November 1979 and concluded, after taking a number of x-rays (which appeared normal), performing other diagnostic tests, and reviewing her medical history, that petitioner had "the resid-

uals of a low back strain which apparently began in 1974 and has continued for the past five years." He recommended that she continue with a low back exercise program, lose weight, and walk up to two miles a day.

Meanwhile, in October 1979, District Medical Director Robert S. Smith referred petitioner to Dr. Everett Gordon for an independent medical examination to determine the nature and extent of petitioner's disability, apparently to assess her eligibility for benefits. Dr. Gordon, an orthopedic surgeon, reviewed her medical records and, after examining petitioner in January 1980, diagnosed her with "probable anxiety state, pre-disposing to subjective back complaints [and] chronic obesity." Dr. Gordon advised petitioner that returning to work on a part-time basis "may be helpful in dissipating her nervous overlay." Although he reported "no objective finding of disability from the accident of 2–21–79," he referred her to neurologist Dr. Harold Stevens to determine whether her "nervous problem" was related to the accident. On March 12, 1980, Dr. Stevens performed a neurological evaluation of petitioner and reported that petitioner was "manifesting symptoms of lumbar radiculopathy[2] involving predominantly L4–L5." Dr. Stevens then requested electrodiagnostic tests, which included a nerve conduction study and an EMG,[3] to confirm his preliminary diagnosis. After performing those tests, fellow neurologist Dr. Wu S. Chiu informed Dr. Stevens that the EMG showed evidence of "S1 radiculopathy" and

---

1. A myelogram is "[a]n x-ray picture of the spinal cord, especially one made after the injection of a contrast substance in the subarachnoid space ... of the spine. A contrast substance ... helps in bringing out the details." 2 J.E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE AND WORD FINDER, M–205 (1992).

2. Radiculopathy is a disease of the spinal nerves. See 3 J.E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE AND WORD FINDER, R–8 (1991).

3. An EMG, or electromyogram, is a test that measures muscle response to nervous stimulation. See 2 J.E. SCHMIDT, M.D., ATTORNEYS' DICTIONARY OF MEDICINE AND WORD FINDER, E–47 (1992).

"mild partial denervation." In his March 28, 1980 report, Dr. Stevens concluded that petitioner's "signs and symptoms reflect the result of the injury on February 21, 1979, which exacerbated her pre-existing low back strain, further aggravated by obesity."

The following year, in February 1981, petitioner underwent a second round of nerve conduction studies and an EMG with neurologist Dr. Ramon Jenkins. Although "[s]pecial attention was paid to muscles supplied by L–5 and S–1" Dr. Jenkins concluded that the examination revealed "no evidence of denervation." Similarly, in a report dated March 13, 1981, Dr. Collins described the results of these exams as "essentially normal." In April 1984, however, Dr. Hereward S. Cattell reviewed the results of these examinations and concluded, contrary to Dr. Jenkins and Dr. Collins, that the results "supported the presence of some denervation potentials in the right leg." Dr. Cattell further diagnosed petitioner with a "degenerative lumbosacral disc condition" and "exogenous obesity." X-rays taken of her spine at various angles showed a "narrowing at the L–5, S–1 interbody space." According to Dr. Cattell, the degree of petitioner's disability was "substantial" and was, in fact, related to the injury she had sustained in February 1979. He did, however, indicate that petitioner might be able to work, with certain restrictions, on a half-time basis.

As her treating physician from the time of her accident until she moved to Redding, California in November 1985, Dr. Collins saw petitioner regularly every four to six weeks. Throughout this period, Dr. Collins maintained that petitioner was un-able to resume work due to her severe and chronic back pain.[4] After moving to California, petitioner began treatment with Dr. William Snider, an orthopedic surgeon. In a 1986 medical report, Dr. Snider wrote that petitioner appeared to have a "chronic back condition with evidence of S1 radiculopathy" but that the condition was "controlled generally satisfactorily with Darvocet–N 100 and Robaxin." In 1987, Dr. Snider added physical therapy to her regimen of treatment.

In January 1990, at the request of the Division of Disability Compensation, Dr. Henry L. Feffer reviewed petitioner's medical records and conducted an independent medical examination. Dr. Feffer issued a report to the Division of Disability Compensation on January 12, 1990, concluding that petitioner "never has had her symptoms objectively confirmed in spite of multiple examinations and tests ...." Although he assessed her a "5% permanent partial physical impairment to her body as a whole" based on her "chronic pain syndrome," Dr. Feffer stated that there was "absolutely no reason why she could not resume productive employment" provided that her activities conformed to certain restrictions.

In May 1990, petitioner flew to Washington, D.C. for another independent medical examination. Dr. Louis E. Levitt reviewed petitioner's medical records and performed a physical evaluation, concluding on May 18, 1990 that "although [petitioner] appears to be handicapped from persisting back pain that probably has at its basis some degenerative disc disease, I believe that pathology pre-existed the pa-

4. For example, in October 1982, he indicated that petitioner's "long-term outlook for this is not too promising." In February 1983, he reported that "[s]he is basically not making any progress and I don't think it is realistic to expect her to get back to her job ...." In November 1983, Dr. Collins suggested that she was "severely restricted" by her pain and could work no more than 10–15 hours a week from her home. In March 1985, he described her as having a "permanent disability."

tient's work trauma and is well-documented as pre-existing the work trauma." Furthermore, in Dr. Levitt's view, petitioner was "certainly capable of handling a sedentary job" and was "not totally disabled."

During this same trip to Washington, D.C., petitioner saw Dr. Collins for the first time since her move to California. Upon examining petitioner and reviewing her medical records, Dr. Collins made the following assessment on May 18, 1990:

> The patient still remains overweight; she weighs about 235 pounds and is 5′5″ tall. She has tried various diets but has been unsuccessful.... She had a previous EMG which showed some changes in the right sciatic nerve. Recent x-rays show narrowing at the L5–S1 interspace which indicate degenerative disc disease there. This is slightly changed since the previous films. On examination the patient has a lot of muscle spasm in her back with marked limitation of motion in flexion and lateral bending and extension due to back pain.... She has some decreased sensation in the right lateral thigh.... Comment—this patient continues to have degenerative disc disease with chronic back strain and radicular pain in the legs. This has not changed and I would not expect any improvement. She remains permanently disabled for gainful employment at this time. This has now been going on for at least 8 years and I do not expect any change in the future except for some increasing problems as seen with aging.

On July 17, 1990, the Office of Disability Compensation terminated petitioner's disability benefits. Thereafter, petitioner requested a hearing to contest the termination of those benefits. A full evidentiary hearing was held on November 14, 1990, after which the Hearing Officer recommended affirmance of the termination of benefits. When the Acting Director For Labor Standards affirmed the termination of benefits, petitioner appealed to the District of Columbia Employees' Compensation Appeals Board ("the Board") which then reversed and remanded the case on October 25, 1995.

On February 5, 1996, a new Hearing Officer recommended that the termination of petitioner's benefits be upheld. Based upon his review of the record established during the 1990 proceedings, the Hearing Officer concluded that petitioner had no further temporary or permanent disability from her 1979 work injury. In reaching this conclusion, the Hearing Officer found that the medical opinions of Drs. Feffer and Levitt were more reliable than the opinion offered by the petitioner's treating physician because they were "the most recent medical reports adduced by either side." Moreover, the Hearing Officer found that "claimant's symptoms were subjective in nature and were not verified through objective medical testing." In his February 13, 1996 Final Compensation Order, the DOES Acting Deputy Director for Labor Standards adopted the Hearing Officer's recommended decision upholding the termination of benefits.

Thereafter, petitioner noted a second administrative appeal. Unfortunately, a comedy of errors prevented the timely resolution of that appeal—portions of the record went missing, the case was remanded in 1998 for a *de novo* hearing for submission of evidence, and after the records were finally reconstituted in June 2000, the parties discovered that the hearing transcript had been misplaced.[5]

---

5. Further complicating matters, effective October 3, 2001, the Board was abolished and DOES was placed in charge of issuing final administrative decisions on disability compensation claims by District employees. *See* D.C. Law 14–28, § 1203(f) & (h), 48 D.C. Reg.

It was not until January 17, 2003 that the Director of DOES affirmed the Final Compensation Order of February 13, 1996. After summarizing petitioner's extensive medical history, the Director concluded that the Hearing Officer's recommended decision was supported by substantial evidence and that the Acting Director had not erred in adopting the recommendations. The Director recognized that the record contained conflicting medical opinions: while petitioner's treating physician, Dr. Collins, believed that petitioner was totally disabled as a result of her 1979 injury, Drs. Feffer and Levitt believed she was not disabled. Because he found that the opinions of Drs. Feffer and Levitt "were the most recent ones presented by either side at the time of the hearing," the Director concluded that the Hearing Officer had reasonably rejected the "stale medical reports" from petitioner's treating physician. On appeal, petitioner has asked this court to review the Director's order.

## Analysis

 As a threshold matter, we point out that because petitioner was an employee of the District of Columbia at the time of her injury, her claim for disability compensation is governed by the District of Columbia Government Comprehensive Merit Personnel Act (the "CMPA"), D.C.Code §§ 1–623.1 et. seq. (2001), for-

merly D.C.Code §§ 1–624.1 et. seq. (1981).[6] When reviewing a decision of the Director regarding entitlement to compensation under the CMPA, this court must determine whether that decision is "supported by substantial competent evidence on the record." See D.C.Code § 1–623.28(b) (2001), formerly D.C.Code § 1–624.28(b) (1981).[7] This court has repeatedly defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Fontenot v. District of Columbia Dep't of Employment Servs., 804 A.2d 1104, 1106 (D.C. 2002) (citation omitted); Canlas v. District of Columbia Dep't of Employment Servs., 723 A.2d 1210, 1211 (D.C.1999) (citation omitted); McEvily v. District of Columbia Dep't of Employment Servs., 500 A.2d 1022, 1023 (D.C.1985) (citation omitted). We apply a three-part test when reviewing an administrative decision under the substantial evidence standard: "(1) the decision must state findings of fact on each material, contested factual issue; (2) those findings must be based on substantial evidence; and (3) the conclusions of law must follow rationally from the findings." Fontenot, 804 A.2d at 1106–7 (quoting Perkins v. District of Columbia Dep't of Employment Servs., 482 A.2d 401, 402 (D.C.1984)).

 On appeal, petitioner argues that DOES erred in failing to defer to the

6981, 7009 (8/3/01) and 48 D.C. Reg. 9567 (10/19/01). See also 7 DCMR § 118, 47 D.C. Reg. 7484, 7485 (9/15/00).

**6.** See Jackson v. District of Columbia Employees' Comp. Appeals Bd., 537 A.2d 576, 577 n. 1 (D.C.1988) ("District of Columbia government employees are not covered by other workers' compensation laws. Instead, a comparable system for providing disability benefits has been established under the District of Columbia Government Comprehensive Merit Personnel Act.") (internal citations omitted).

**7.** The CMPA's "substantial competent evidence" standard of review is nearly identical

to the "substantial evidence" standard outlined in the District of Columbia Administrative Procedures Act ("APA"), D.C.Code §§ 2–509(e) and 2–510(a)(3)(E) (2001), formerly D.C.Code §§ 1–1509(e) and 1–1510(a)(3)(E) (1981). Although the CMPA specifies that DOES is not bound by the APA, see D.C.Code § 1–623.24(b)(2) (2001), formerly D.C.Code § 1–624.24(b)(2) (1981), because the CMPA explicitly provides for the same standard of review as found in the APA, We apply APA cases which expound upon the substantial evidence standard.

opinion of petitioner's treating physician, Dr. Collins.[8] Because Dr. Collins' opinion directly contradicts the findings relied upon by DOES to justify the termination of her benefits, petitioner asserts that the decision was not supported by substantial evidence. Petitioner is correct in pointing out that in workers' compensation cases, the medical opinion of a treating physician is generally entitled to greater weight than the opinions of doctors who have been retained to examine a claimant solely for the purpose of litigation. *See e.g., Lincoln Hockey v. District of Columbia Dep't of Employment Servs.*, 831 A.2d 913, 919 (D.C.2003); *Clark v. District of Columbia Dep't of Employment Servs.*, 772 A.2d 198, 202 (D.C.2001); *Harris v. District of Columbia Dep't of Employment Servs.*, 746 A.2d 297, 302 (D.C.2000); *Short v. Department of Employment Servs.*, 723 A.2d 845, 851 (D.C.1998); *Stewart v. District of Columbia Dep't of Employment Servs.*, 606 A.2d 1350, 1353 (D.C.1992). Although a Hearing Officer remains free to reject the testimony of a treating physician, he cannot do so "without explicitly addressing that testimony and explaining why it is being rejected." *Lincoln Hockey*, 831

A.2d at 919 (citing *Canlas v. District of Columbia Dep't of Employment Servs.*, 723 A.2d 1210, 1212 (D.C.1999)). As we have said, "there would be little force to the preference in favor of a treating doctor's opinion if the agency could ignore that opinion without explanation." *Canlas*, 723 A.2d at 1212.

In the case before us, DOES disregarded the medical opinion of petitioner's treating physician, Dr. Collins, because it deemed that opinion "stale" as compared to the opinions of Drs. Feffer and Levitt. However, DOES's decision to reject Dr. Collins' opinion rests upon an incorrect factual premise. Dr. Levitt examined petitioner on the same day as did Dr. Collins, on May 18, 1990, while Dr. Feffer examined petitioner four months earlier. Therefore, the medical opinions of Drs. Feffer and Levitt were clearly not the "most recent" opinions. Even respondent concedes on brief that "the characterization of 'stale' did not accurately apply to Dr. Collins' May 1990 opinion." Because DOES's justification for rejecting Dr. Collins' opinion is faulty, it has not complied with the treating physician rule.[9]

---

8. In her brief, petitioner makes reference to the 1996 and 2001 medical reports of another treating physician, Dr. Jeffrey W. Grolig. We decline to consider those reports because they were not part of the record upon which the DOES decision was based. Additionally, at oral argument, petitioner pointed out that the Director had failed to consider the medical opinion of her California treating physician, Dr. Snider, whose 1990 reports had been a part of the record at the time the Hearing Officer made his recommendation. Although petitioner indicated at oral argument that the reports had been provided to the Director, they apparently went missing and were not addressed in the Director's decision, nor were they mentioned in petitioner's brief to this court. Without the benefit of having Dr. Snider's 1990 medical opinions before us, we cannot properly address the Director's failure to consider those reports in his decision.

9. Although DOES found that petitioner's "subjective complaints of pain had never been objectively confirmed," the agency does not appear to have considered Dr. Collins' May 18, 1990 report which refers to physical abnormalities that he believed to be objective signs of disability. See page 709, *supra* (stating that "a previous EMG [ ] showed some changes in the right sciatic nerve" and "[r]ecent x-rays show narrowing at the L5–S1 interspace which indicate degenerative disc disease there"). Moreover, the Director's conclusion that petitioner's "duties as a computer programmer were essentially sedentary and thus, would allow her to return to work" is called into question by Dr. Collins' evaluation that petitioner "remains permanently disabled for gainful employment." See page 7, *supra*. On remand, the Director must address Dr. Collins' report and provide an adequate explanation for its choice to either credit or discredit Dr. Collins' conclusions.

■ Respondent argues that this court should limit the treating physician preference to cases arising under the District of Columbia Workers' Compensation Act, D.C.Code §§ 32–1501 et. seq. (2001), formerly D.C.Code §§ 36–301 et. seq. (1981). In support of this contention, respondent points to two differences between the Workers Compensation Act (which applies to employees in the private sector) and the CMPA (which applies to government employees such as petitioner). First, respondent asserts that the treating physician preference is somehow related to the Workers Compensation Act's presumption that employees' injuries are compensable. See D.C.Code § 32–1521 (2001), formerly D.C.Code § 36–321 (1981). Because the CMPA does not contain a similar presumption of compensability, respondent argues that the treating physician preference should not apply here. Second, respondent points out that while the CMPA's disability compensation program is funded by local government taxes, see D.C.Code § 1–623.42 (2001), formerly D.C.Code § 1–624.42 (1981), the private sector program under the Workers Compensation Act is privately funded by employers "principally by premium payments to large, national insurance companies." See D.C.Code §§ 32–1534, 32–1540 and 32–1541 (2001), formerly D.C.Code §§ 36–334, 36–340, and 36–341 (1981). According to respondent, because the insurance companies' profits depend on minimizing payouts for benefits to injured workers, medical experts designated by insurance companies are more likely to be biased than medical experts designated by the government.

Contrary to respondent's first claim, the treating physician preference appears wholly unrelated to the Workers Compensation Act's presumption of compensability. In a recent opinion, we explained the twofold rationale for our treating physician preference: As compared to a doctor retained solely for litigation purposes, we said that a treating physician was (1) less apt to be consciously or subconsciously biased by the litigation, and (2) more likely to be familiar with the patient's condition because he or she has typically spent a greater amount of time with the patient. See Lincoln Hockey, 831 A.2d at 919. Likewise, we are unpersuaded by respondent's suggestion that disability compensation claims under the CMPA are somehow less "adversarial" than claims arising under the Workers Compensation Act. We see no reason why a claimant employed by the District should be treated any differently than a claimant employed in the private sector when it comes to assessing the credibility of that claimant's treating physician's testimony.

Furthermore, although the treating physician preference was established in cases arising under the Workers Compensation Act, see, e.g., Stewart, 606 A.2d at 1353, the preference is commonly applied at the administrative level in cases arising under the CMPA. See, e.g., Smallwood v. District of Columbia Dep't of Mental Health, 2003 DC Wrk. Comp. Lexis 258, *16–17 (August 18, 2003); Berryman–Turner v. District of Columbia Dep't of Corrections, 2003 DC Wrk. Comp. Lexis 322, *19–20, (October 1, 2003). In fact, even in the instant case, both the Hearing Officer and the Director applied the treating physician preference before rejecting Dr. Collins' testimony as "stale." Given that the agency entrusted with carrying out the CMPA's mandate has determined that the treating physician

Furthermore, to the extent that petitioner is able to reconstitute the record on remand to include the 1990 reports of treating physician Dr. Snider, the Director must apply the treating physician preference to those reports as well. Again, if the Director chooses to discredit Dr. Snider's conclusions, an adequate reason must be provided.

preference applies to CMPA cases, we defer to that determination because it is not "plainly erroneous or inconsistent with the statute." *See District of Columbia v. Davis,* 685 A.2d 389, 393 (D.C.1996) (stating that "[w]e refrain from substituting our judgment 'in areas of expertise reserved for the agency.'") (citation omitted).

■ Respondent further argues that, regardless of whether the treating physician preference is applicable to the instant case, DOES was permitted to reject the treating physician's opinion if it had a reasonable basis for doing so. *See, e.g., Canlas,* 723 A.2d at 1212. Focusing on a number of problems that respondent found in Dr. Collins' May 1990 opinion, including the fact that five years had elapsed since Dr. Collins had regularly treated petitioner, respondent asserts that the Hearing Officer had ample reason to reject Dr. Collins' opinion. However, neither the Hearing Officer nor the Director relied on

any of these reasons in rejecting Dr. Collins' opinion. "An administrative order can only be sustained on the grounds relied on by the agency; we cannot substitute our judgment for that of the agency." *Jones v. District of Columbia Dep't of Employment Servs.,* 519 A.2d 704, 709 (D.C.1987) (citing *Securities and Exchange Comm'n v. Chenery Corp.,* 318 U.S. 80, 87–88, 63 S.Ct. 454, 87 L.Ed. 626 (1943)).

For the foregoing reasons, this matter must be reversed and remanded for further proceedings consistent with this opinion.

*So ordered.*