Linda D. JACKSON, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent

and

Washington Metropolitan Area transit
Authority, Intervenor.

No. 05–AA–1114.

District of Columbia Court of Appeals.

Argued Feb. 23, 2007.

Decided Sept. 4, 2008.

Matthew Peffer, argued for petitioner. Benjamin T. Boscolo, Greenbelt, MD, was on the brief, for petitioner.

Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the statement was filed, Todd S. Kim, Solicitor General, and Edward E. Schwab, Deputy Solicitor General at the time a statement was filed, filed a statement in lieu of brief, for respondent.

Mark H. Dho, Assistant General Counsel, with whom Carol B. O' Keeffe, General Counsel for Washington Metropolitan Area Transit Authority, and Mark F. Sullivan, Deputy General Counsel of the Washington Metropolitan Area Transit Authority, were on the brief, for intervenor.

Before RUIZ and THOMPSON, Associate Judges, and NEBEKER, Senior Judge.[*]

RUIZ, Associate Judge:

Petitioner, Linda D. Jackson, seeks our review of the Compensation Review Board's ("CRB") affirmance of the Administrative Law Judge's ("ALJ") denial of her claim for medical treatment and payment of medical expenses for the treatment of an injury to her left knee that she claims is the natural consequence of a work-related injury to her right knee, suffered in 2001, or, in the alternative, arose from the aggravation of a previously diagnosed medical condition triggered by the same injury at work. Because the ALJ overlooked evidence that would offer substantial support to petitioner's claim, we reverse the CRB's decision, and remand the case for further proceedings.

**Factual Summary**

Petitioner, who as of the 2003 hearing before the ALJ had worked as a Washington Metropolitan Area Transit Authority ("WMATA") bus driver for over 20 years, has a long-standing history of pain in both knees. In May 1993, her then-treating physician at Group Health Association suspected that she suffered symptoms of crepitus in both knees.[1] Petitioner had pain and swelling after she hit her left knee against the steering column while driving intervenor's bus in February 1997, for which she filed a claim. On July 2, 1997, Dr. David C. Johnson diagnosed petitioner as having a significant amount of crepitus in both knees, as well as persistent pain associated with chondromalacia of the patella (knee cap) in the left knee.[2] Later that same year, on November 18, 1997, petitioner was again diagnosed at Kaiser Permanente as having bilateral knee pain.

---

[*] Associate Judge Farrell took part in the oral argument of this case. He subsequently recused, and was replaced by Senior Judge Nebeker.

1. Crepitus is a "clinical sign in medicine characterized by a peculiar crackling, crinkly, or grating feeling or sound ... in the joints.... Crepitus in a joint can represent cartilage wear in the joint space. The term 'crepitus' is taken directly from the Latin 'crepitus' meaning 'a crackling sound or rattle.'" MedicineNet.com, Definition of Crepitus, http://www.medterms.com /script/main/art.asp?article12061 (last visited Aug. 22, 2008).

2. Chondromalacia of the patella "is the softening and degeneration of the tissue (cartilage) underneath the kneecap." MedlinePlus, Definition of Chondromalacia Patella, http://www.nlm.nih.gov/medlineplus/ency/ article/000452.htm (last visited Aug. 22, 2008).

On December 2, 1998, Dr. Tobin A. Finizio made similar findings of degenerative changes in the patella consistent with chondromalacia in both knees. Two days later, petitioner reported continuing bilateral anterior knee pain. On December 9, petitioner sought medical treatment at Southern Maryland Physical Therapy Services for her knees, whereupon an X-ray examination revealed arthritis in both knees.

On July 27, 1999, petitioner sought treatment from Dr. J. Michael Joly, who diagnosed her knee condition as "[s]evere symptomatic bilateral patellofemoral pain syndrome." Up until this point petitioner's pain had been more acute in her left knee, but she told Dr. Joly that the right knee was "catching up." Dr. Joly opined that 80 percent of petitioner's condition was attributable to her excessive body weight.

On February 17, 2001, petitioner again struck her knee—this time the right knee—hitting the fare box while she was on the job in the bus.[3] She attempted to continue working that day, but, due to significant pain in the knee, she had to stop a few hours later. Within a few days of the incident, petitioner saw her primary care physician at Kaiser, who diagnosed her with a knee contusion, and prescribed anti-inflammatory medication, putting ice on the knee, and rest (without work) for about eight days. When petitioner reported to work at her usual position as a bus driver, she was instead given modified employment as a parking lot attendant, which required her to watch the parking lot-a position entailing only minimal walking.

Petitioner worked as a parking lot attendant until approximately July 2001, when she resumed her duties as a bus driver.

Due to the worsening condition of her right knee, petitioner was referred to an orthopedic surgeon, Dr. Shaheer Yousaf, whom she first saw on August 16, 2001. Petitioner did not disclose her past history of knee problems to Dr. Yousaf. After an examination, Dr. Yousaf diagnosed petitioner's condition as patellar contusion and recommended physical therapy. When her pain was not alleviated by that course of treatment, petitioner discussed surgical options with Dr. Yousaf. Based on a magnetic resonance imaging test ("MRI") performed on October 8, 2001, which showed mild to moderate chondromalacia of the patella in petitioner's right knee, petitioner underwent arthroscopic surgery of the right knee on January 22, 2002. The surgery revealed that the chondromalacia was at an advanced stage, and Dr. Yousaf debrided the patella.[4] Petitioner recuperated for several months, during which she initially walked with crutches, received injections, and participated in a rehabilitation program for strength and flexibility. By March 14, 2002, petitioner had improved by 70 to 75 percent but still had difficulty getting up from a seated position.

On May 13, 2002, approximately four months after surgery, and for the first time since she had injured her right knee on the bus in February 2001, petitioner reported left knee pain. Although there had been no specific incident or trauma that precipitated said pain, Dr. Yousaf's examination found tenderness in the back of petitioner's left knee and along the

---

**3.** It is not disputed that the injury to the right knee was work-related and its medical treatment was compensable.

**4.** To debride is to "remove dead, contaminated or adherent tissue or foreign material. The purpose of wound debridement is to remove all materials that may promote infection and impede healing." MedicineNet.com, Definition of Debride, http://www.medterms.com/ script/main/art.asp?article40481 (last visited Aug. 22, 2008).

kneecap, fluid in the knee joint, and patellofemoral crepitation (knee noise upon flexion and extension, see note 1, *supra*). Dr. Yousaf immediately ordered X-rays of the left knee joint, which revealed patellofemoral degeneration. On July 1, 2002, an examination of petitioner's left knee revealed continued tenderness, effusion, and patellofemoral crepitations. Dr. Yousaf recommended a non-invasive course of treatment (physical therapy) for petitioner's left knee as he had originally prescribed for the right knee, with the possibility of arthroscopic surgery in the future.

On July 29, 2002, after examining petitioner's right knee, Dr. Yousaf determined that operating the foot controls and repetitive knee bending required in driving a bus rendered petitioner incapable of working as a bus driver because it would entail too much pushing and/or pulling on her right leg. Following Dr. Yousaf's determination, petitioner returned to her position as a parking lot attendant from October 21, 2002, to April 19, 2003. The next day she resumed her usual employment as a bus operator.

After petitioner complained to Dr. Yousaf on April 15, 2003, that she was experiencing pain in *both* knees, intervenor referred petitioner for examinations by Dr. Louis Levitt, an independent medical examiner ("IME"). On July 30, 2002, Dr. Levitt conducted a physical examination that required petitioner to walk on her toes and heels, squat, and flex and extend her knee. Dr. Levitt found that petitioner's "past medical history is non-contributory in any manner to her current complaints of right knee pain." On March 25, 2003, Dr. Levitt conducted a second physical examination of petitioner, which involved the same tests as the first examination, with the exception of a straight leg raising, lumbar spine mobility and tenderness tests. In this second diagnosis, Dr.

Levitt found that petitioner's "mechanism of injury doesn't fit her level of disability," and, therefore, "her physical findings should not preclude [petitioner] from returning to work operating a metro bus." Petitioner did not complain of left knee pain during either of the IME's examinations, nor did she divulge her history of bilateral knee pain, but instead led Dr. Levitt to believe that there was none. Petitioner explained that she did not complain about her left knee symptoms because a claims adjuster had told her that anything beyond her right knee injury would be considered irrelevant to an independent medical examination.

Petitioner filed a claim for expenses related to treatment of her left knee, which was denied by the ALJ.

### Analysis

■■■ We review agency decisions to determine if their findings are supported by substantial evidence in the record. *See RosExpress, Inc. v. D.C. Dep't of Employment Servs.*, 602 A.2d 659, 661 (D.C.1992). In reviewing such decisions, we must determine whether they flow rationally from the facts, and whether or not they are grounded on an error of law. We must affirm an agency decision unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Olson v. D.C. Dep't of Employment Servs.*, 736 A.2d 1032, 1037 (D.C.1999).

Petitioner is entitled to a statutory presumption of compensability, which provides, in the absence of substantial evidence to the contrary, that a claim is compensable in accordance with the worker's compensation provisions. *See* D.C.Code § 32–1521(1) (2001) ("In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of evidence to the contrary: (1) That the claim

comes within the provisions of [the worker's compensation] chapter ...."); *see also Dunston v. D.C. Dep't of Emp. Servs.*, 509 A.2d 109, 111 (D.C.1986) ("This preliminary shifting of the burden to the employer exemplifies the 'humanitarian nature of the Act[ ]' and the 'strong legislative policy favoring awards in arguable cases.'" (citations omitted)).

■ To raise the presumption, a claimant must make an initial showing that he or she sustained injuries and a work-related event that has the potential of contributing to the injuries. *See Ferreira v. D.C. Dep't of Employment Servs.*, 531 A.2d 651, 655 (D.C.1987). Once this minimal initial showing is made, the presumption establishes a causal connection between the claimant's injury and the work-related event, *see id.*, and the employer must present specific evidence in order to sever the presumed causal relationship between claimant's injury and his or her employment. "Absent employer evidence 'specific and comprehensive enough to sever the potential connection between a particular injury and a job-related event,' the compensation claim will be deemed to fall within the purview of the statute." *Parodi v. D.C. Dep't of Employment Servs.*, 560 A.2d 524, 526 (D.C.1989) (quoting *Ferreira*, 531 A.2d at 655). Once the employer presents such evidence, the presumption falls away, *see Ferreira*, 531 A.2d at 655, and the ALJ weighs all the evidence, according to the treating physician's conclusion "greater weight than the opinion of employer's IME physician." *Lincoln Hockey, LLC v. D.C. Dep't of Employment Servs.*, 831 A.2d 913, 917 (D.C.2003).

In this case, the ALJ found that "[t]hrough the opinion of her treating physician, Dr. Yousaf, ... [petitioner] invoke[d] a presumed relationship between the condition of her left knee and the work-related injury," but that by impeaching petitioner's testimony—based on her failure to reveal her medical history concerning her left knee to Dr. Yousaf, and the fact that she did not complain of left knee pain to the IME—coupled with Dr. Levitt's deposition,[5] the "employer ... produced specific, credible evidence sufficient to sever the presumed causal relationship between [petitioner's] left knee [injury] and her employment." The ALJ therefore went on to the next step, weighing all the evidence without the presumption of compensability, and was not persuaded by the treating physician's opinion which he considered to be misinformed and based on "misplaced reliance" on petitioner's subjective reports of pain. Instead, the ALJ credited the opinion of Dr. Levitt, who opined that petitioner's left knee condition was a recurrence of her previously diagnosed injury to that knee. On appeal, the CRB concluded that the ALJ did not err in relying "on the opinion of IME physician, Dr. Louis Levitt ... [and] accordingly, finds no error with the ALJ's determination that [employer] met its evidentiary burden of producing specific credible evidence sufficient to sever the presumed causal relationship between petitioner's left knee and her employment." Based on the same evidence, the CRB agreed with the ALJ's ultimate findings of fact and conclusions of law.

■ Petitioner argues that her left knee condition is medically a natural or unavoid-

---

5. In his deposition, after being advised of petitioner's history of pain to both knees, Dr. Levitt stated: "[w]e have established a pattern of someone who has reoccurring knee distress from overuse, from day-to-day activi- ties most of it left, but, in '98 and '99, it was bilateral left and right ... so there was an established pattern that this patient has a preexisting knee pathology."

able result of the right knee injury she suffered on the job on February 17, 2001. She contends that her treating physician's report, noting that her "recent symptoms of [left knee] pain aggravation [were] causally related to her right knee injury which places excessive physical demands on the left knee," amounts to substantial evidence proving that her left knee symptoms were causally related to the 2001 work-related injury to her right knee. During his deposition, Dr. Yousaf testified that as a result of the pain in her right knee petitioner "would load more" and "[p]ut more pressure on the left knee." This testimony, she argues, should have compelled a finding in her favor. The ALJ, however, determined that Dr. Yousaf's opinion was not reliable because he was not informed about the medical history of petitioner's left knee, and because he relied on petitioner's subjective complaints, which the ALJ did not find credible. Based on Dr. Levitt's diagnosis, the ALJ concluded that petitioner's left knee pathology did not result from the 2001 work-related injury to the right knee, but was due to the preexistent medical condition in her left knee that petitioner had failed to disclose to Dr. Yousaf.

The record, however, does not support the ALJ's conclusion that Dr. Yousaf's opinion was misinformed. Before he provided his deposition testimony, Dr. Yousaf was made aware that other physicians had determined that petitioner had been suffering degenerative changes in the patella consistent with chondromalacia in *both* knees. Dr. Yousaf was also informed that before consulting with him, petitioner had been experiencing bilateral knee pain for many years. Although petitioner had not been completely candid with Dr. Yousaf about her prior history of left knee pain, trauma, and diagnosis, Dr. Yousaf was completely briefed about that history at his deposition, during which all medical documentation was provided to him for his review. After reviewing petitioner's documented medical history, Dr. Yousaf did not change his opinion regarding his diagnosis of petitioner's condition:

Q. But you do understand and you do believe that periodically since 1993 Ms. Jackson has had pain without trauma?

A. Correct

. . . .

Q. Do any of the records that you've seen today and that you've been asked to comment on change any of the opinions you've expressed about the relationship between Ms. Jackson's current left knee condition and right knee injury she suffered on February 16th of 2001?

A. No, sir. I do believe that she had a history of *knee pain* in the past, but I don't see any correlation between the kind of pain she has now and the pain she had then.

Dr. Yousaf explained that he did not agree with prior diagnoses of chondromalacia in petitioner's left knee because, in his opinion, they were conclusory and not supported by reliable tests. For instance, Dr. Yousaf did not agree with Dr. Johnson's 1997 diagnosis of chondromalacia, explaining that a mere finding of tenderness over the anterior surface of the knee could not possibly lead to such conclusion. Dr. Yousaf believed that an arthroscopy, which is the surgery that he conducted on petitioner's right knee, is the best test to determine chondromalacia. Additionally, Dr. Yousaf found Dr. Joly's similar diagnosis in 1999 to be unreliable. Dr. Joly's chondromalacia diagnosis was the result of an X-ray conducted on petitioner's knees, but according to Dr. Yousaf, "the × rays [are] not a test which is being done or is being used or has been recommended by the Academy of the Board of Orthopaedic Surgeons to diagnose [chondromalacia]. . . . An X-ray can only tell about the

patellar alignments.... X-rays don't show the cartilage." Finally, Dr. Yousaf characterized the prior chondromalacia diagnoses as "not educated conclusions," and for the reasons explained above, not correct, "as a matter of fact." Therefore, although Dr. Yousaf's reports during his treatment of petitioner did not reflect the "complete picture" of her medical history, by the time of his deposition, Dr. Yousaf was fully informed.[6]

The ALJ also concluded that Dr. Yousaf's opinion was faulty because it relied on petitioner's "subjective symptomology" regarding her left knee, a reliance he found to be misplaced because of petitioner's "impugned credibility." As Dr. Yousaf testified, however, he also relied on X-rays which revealed patellofemoral degeneration, and other tests such as a tenderness exam in which he subjected certain anatomical areas to pressure, finding that "if there is consistent tenderness of those anatomically specific areas, that is an *objective* response of the patient." In light of these flaws in the ALJ's findings, we remand the case so the ALJ can weigh Dr. Yousaf's opinion on causation in light of all the evidence of record.

■ Petitioner argues that the ALJ also erred in not considering that her current left knee condition resulted from the 2001 work injury's aggravation of her previously diagnosed condition of that knee.[7] Although the ALJ did not expressly address the issue of aggravation, her reasoning appears to have implicitly rejected it:

> And, in the specific instance of this particular claimant, given her past medical history in which she has already been diagnosed with bi-lateral chondromalacia and chronic pain syndrome, as well as become symptomatic *due to non-traumatic reasons*, it stands to reason that this *is another episode in her ongoing knee pathology.*

(emphasis added). The ALJ's finding that attributes petitioner's left knee condition entirely to her prior history of knee illnesses eliminated the 2001 work incident as the aggravating cause of her current symptoms, and implicitly rejected the possibility that the 2001 work-related injury aggravated petitioner's prior condition. Instead, the ALJ deemed petitioner's left knee condition to be simply "another episode" of her previously-diagnosed illness, not a different or aggravated injury. On appeal, the CRB considered "this error harmless in light of the ALJ's failure to find [p]etitioner actually sustained any injury which could be considered causally related to the original injury regardless of whether an injury resulted as a result of an aggravation or natural consequence."

"It is well established that in the District of Columbia, a disability resulting from the aggravation of a pre-existing condition is compensable under the Worker's

---

**6.** Although the ALJ acknowledged that Dr. Yousaf had been made aware of petitioner's medical history, the ALJ still deemed Dr. Yousaf's medical opinion faulty because it relied on petitioner's incomplete account of the medical history regarding her left knee. In this regard, the ALJ's conclusion was internally inconsistent, and thus, did not " 'flow[] rationally from the facts.' " *Georgetown Univ. Hosp. v. D.C. Dep't of Employment Servs.,* 929 A.2d 865, 869 (D.C.2007) (quoting *Oubre v. D.C. Dep't of Employment Servs.,* 630 A.2d 699, 702 (D.C.1993)).

**7.** As noted, petitioner had suffered a work-related injury to her left knee in 1997, for which she filed a claim. No argument has been made that the injury to that same knee that is the subject of the current claim is a sequelae or aggravation of the 1997 work injury. As we discuss in the text, because aggravation of a preexisting injury is compensable, it does not matter whether that preexisting injury was itself work related.

Compensation Act...." *Clark v. D.C. Dep't of Employment Servs.*, 772 A.2d 198, 202 (D.C.2001) (citing D.C.Code § 36–308(6)(A) (Supp. 2000) (current version at D.C. Code § 32–1501 (2001))). As we are remanding the case so that the ALJ may reconsider Dr. Yousaf's opinion on causation, the issue of aggravation should be expressly addressed. *See Hill v. D.C. Dep't of Employment Servs.*, 717 A.2d 909, 912 (D.C.1998) (holding that administrative response to each claim is necessary to allow appropriate development of issues for judicial review). In this regard, we note that in his report, Dr. Yousaf stated that petitioner's "recent symptoms [of left knee] pain *aggravation* [were] causally related to her right knee injury which places excessive demands on the left knee." (emphasis added). Dr. Yousaf's opinion that petitioner's left knee condition was aggravated from the excessive weight placed on it as a result of the surgery to treat the 2001 work-related injury to her right knee was based on his general experience that overuse of one leg often places "excessive physical demands" on it and hence, aggravation of a pre-existing condition could result. This was confirmed by Dr. Levitt, whose opinion the ALJ credited.[8] Viewed against this unanimous medical opinion, petitioner's extensive prior symptomology in her left knee (crepitus in 1993, chondromalacia and knee pain in 1997, arthritis and degenerative changes in the patella consistent with chondromalacia in 1998, and severe symptomatic patellofemoral pain syndrome in 1999), which the ALJ credited, strengthens petitioner's argument that her current left knee symptoms resulted from the aggravation of her pre-existent condition, which was triggered by the surgery to treat the 2001 work-related injury to the right knee.

Thus, we vacate the decision of the CRB and remand the case so that the ALJ can reconsider Dr. Yousaf's opinion in light of all the evidence and rule specifically on the issue of aggravation.

*Reversed and remanded.*

Concurring opinion by Senior Judge NEBEKER.

NEBEKER, Senior Judge, concurring:

I agree that the ALJ's conclusions do not "flow rationally from the facts." *Georgetown Univ. Hosp. v. D.C. Dep't of Employment Servs.*, 929 A.2d 865, 869 (D.C.2007). As the opinion of the court points out, the ALJ's order is internally inconsistent. The ALJ bases her conclusion that Dr. Yousaf's testimony is entitled to limited weight on the ground that petitioner had not provided him with a fulsome medical history. Yet, the ALJ fails to consider and reconcile the fact that during his deposition, Dr. Yousaf *is* informed of petitioner's medical history and reaffirms his diagnosis after being informed of her history.

In light of this inconsistency, substantial evidence does not support the ALJ's findings. A "reasonable mind" could not find the record adequate to support the ALJ's conclusion, *Giles v. D.C. Dep't of Employment Servs.*, 758 A.2d 522, 524 (D.C.2000), particularly since the treating physician's opinion is preferred over that of a medical expert retained for purposes of litigation. *Hisler v. D.C. Dep't of Employment Servs.*, 950 A.2d 738, 746 n. 9 (D.C.2008). While the ALJ may reject the opinion of the treating physician, she must give "specific and legitimate reasons for doing so."

8. According to Dr. Levitt's deposition, "when someone has an injury to one limb, the other limb takes over and becomes the main weight bearing limb. That is classic for all patients I see, that the opposite limb does more work."

*Mexicano v. D.C. Dep't of Employment Servs.*, 806 A.2d 198, 205 (D.C.2002) (citing *Olson v. D.C. Dep't of Employment Servs.*, 736 A.2d 1032, 1041 (D.C.1999)). Because those reasons are inconsistent with the record in this case, remand is proper. *Upchurch v. D.C. Dep't of Employment Servs.*, 783 A.2d 623, 628–29 (D.C.2001).[1]

Accordingly, I join in the opinion of the court vacating and remanding.

1. For example, in *Kralick v. D.C. Dep't of Employment Servs.*, 842 A.2d 705, 711 (D.C. 2004), this court remanded an agency decision because the rejection of the treating physician's testimony was "faulty." In *Kralick*, the agency discredited the treating physician's opinion because it was not the most recent opinion, which was factually incorrect. *Id.* In *Mexicano*, 806 A.2d 198, this court reversed an agency ruling of non-compensability where its reasons for rejecting the treating physician's diagnosis were "not supported by the record." *Id.* at 205–06. The agency discounted the treating physician's diagnosis because it was not based on valid assumptions concerning the employee's medical history. However, the record demonstrated that the treating physician was aware of the salient aspects of the claimant's medical history. *Id.* at 206.